IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

CASSIDY PRICE,

and

CHRISTIAN PRICE,

and

PRICE BROTHERS JERSEYS, LLC,
f/k/a M&P DAIRY, LLC,

    Plaintiffs,

v.　　　　　　　　　　　　　　　　　　　　　Civil Action No. __7:18CV275__

H. RONALD SHELTON,

    Serve: 8235 Old Franklin Turnpike
           Glade Hill, Virginia 24092

and

RONALD EDWARD SHELTON,

    Serve: 411 Buckscrape Road
           Union Hall, Virginia 24176

    Defendants.

## COMPLAINT

Plaintiffs Cassidy Price, Christian Price (collectively "Price"), and Price Brothers Jerseys, LLC, f/k/a M&P DAIRY, LLC (the "LLC"), by counsel, for their Complaint against Defendants H. Ronald Shelton and Ronald Edward Shelton (collectively "Shelton"), state as follows:

## Parties & Nature of Action

1. This action is for breach of a lease agreement by Shelton and Shelton's negligence in failing to remedy an unsafe condition existing on his property.

2. Price leased certain real property and improvements from Shelton for residential purposes and for the operation of a dairy by the LLC. The LLC was organized under Virginia law, but it surrendered its certificate of organization with Virginia effective March 30, 2018. Plaintiffs Price were the sole members of the LLC.

3. Plaintiffs Price reside in Statesville, North Carolina, and presently intend to remain in North Carolina. They have organized a limited liability company under the laws of North Carolina to operate a dairy farm there, and are pursuing the purchase of real property there for a permanent dairy operation. Christian Price has lived and worked in North Carolina for the last two years, and Cassidy Price and his family joined him in North Carolina to jointly run the new dairy operation and reside there several months ago.

4. Defendants are residents of Franklin County, Virginia, and the property they leased to Price is also located there.

## Jurisdiction & Venue

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiffs and Defendants are citizens of different states, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

6. This Court has personal jurisdiction over Defendants, and venue is proper in this forum, because Defendants reside in Franklin County, Virginia, and this cause of action arises from events occurring in Franklin County, Virginia.

## Facts

7. Price and Shelton entered into a written "Lease Agreement" dated April 3, 2014. A true copy of the Lease Agreement is attached hereto as **Exhibit 1**. The interest of the third lessee named in the Lease Agreement was acquired by Price.

8. Pursuant to the Lease Agreement, Price leased from Shelton all "dairy facilities, barns, milking parlor, feed bins, the shop, milking equipment, milk tank, water heaters, conveyors, augers, and water system." (Exh. 1 at § 1(b)).

9. Pursuant to the Lease Agreement, Price also leased from Shelton the "Home (residence) located next door to the Dairy Facility." (Exh. 1 at § 1(c)). Cassidy Price and his wife resided in this home during the term of the lease, including while his wife was expecting their first child.

10. Price made a security deposit to Shelton of $5,500, and made an additional $3,000 directly to a utility provider.

11. Section 3(a) of the Lease Agreement, titled "MAINTENANCE," provided:

> All maintenance, upkeep, and normal repairs of the leased premises, including the dairy parlor, outbuildings, stalls, fences, gates, milking equipment, augers, ventilation fans, and electric motors, shall be the sole responsibility of, and the cost thereof, shall be borne by LESSEE. SHELTON agrees to have all of the above in proper working order at the effective time of the lease. SHELTON is responsible for major structural maintenance from acts of God and replacement unless through LESSEE negligence.

12. Section 10 of the Lease Agreement, titled "WATER," provided:

> SHELTON shall supply sanitary running water, adequate for 250 cows, for all of the leased premises with the exception of the pastures aforesaid. All upkeep of water pumps, water heaters, storage tanks, automatic cattle waterers, or anything else pertaining to water system, except digging a well and laying water pipe to the well and adjacent storage box, will be the responsibility of LESSEE.

13. Section 13 of the Lease Agreement, titled "COMPLIANCE WITH LAWS AND REGULATIONS," provided:

> The SHELTONS jointly and severally represent and warrant that the Leased Facilities do, as of the Effective Date hereof, comply with all applicable laws, ordinances and regulations of duly constituted public authorities now or hereafter in any manner affecting the Leased Premises or the use thereof.

14. Thus, under the Lease Agreement, Shelton agreed (i) to have the leased premises "in proper working order at the effective time of the lease;" (ii) to be "responsible for major structural maintenance from acts of God;" and (iii) to be responsible for "replacement" of structures and other items. (Exh. 1 at § 3(a)).

15. Price agreed to be responsible for "maintenance, upkeep and normal repairs." (Exh. 1 at § 3(a)). In other words, Price agreed to keep up the premises in proper working order, as Shelton was required to provide the premises in such proper working order when Price assumed tenancy.

16. In reliance on the Lease Agreement, Plaintiffs invested approximately $200,000 in capital in furtherance of the dairy operation, including for equipment, start-up costs, and improvements. Plaintiffs reasonably anticipated net profits relating to milk production of $800,000 based on milk prices, production history, and other factors.

17. Shelton was aware of the intended dairy operation by the LLC on the leased property, and the parties clearly and definitely intended to benefit the LLC through the Lease Agreement by providing the premises upon which milk would be produced for sale and distribution by the LLC. Shelton assumed the obligations under the Lease Agreement for the benefit of Price and the LLC.

18. In reliance on the terms of the Lease Agreement, the LLC contracted with the Maryland and Virginia Milk Producers Cooperative Association, Inc. (the "Milk Co-op") to

4

supply it with milk produced at the property. A true copy of the contract with the Milk Co-Op is attached hereto as **Exhibit 2**.

19. Under the Lease Agreement, Shelton agreed to have the leased premises "in proper working order at the effective time of the lease." (Exh. 1 at § 3(a)).

20. The leased premises was not in proper working order at the effective time of the lease.

21. Three wells supplied water to the property. These wells fed into a large underground storage box. The wells and/or storage box were not in proper working order, as they allowed for unacceptable levels of manganese to enter the water supply. At least two of the wells had manganese contamination much greater than acceptable levels. In addition, the underground storage box also had a crack or hole, and the storage box contained coliform bacteria. The wells and underground storage box required significant repairs and/or replacement to remedy these problems and to satisfy Shelton's obligations, including to ensure that they were in proper working order. Shelton knew or should have known about the problems with the wells and storage box before and at the effective time of the lease.

22. Shelton also agreed to "supply sanitary running water, adequate for 250 cows, for all of the leased premises," with the exception of some pastureland, and to ensure the facilities complied with all applicable laws, ordinances, and regulations of public authorities. (Exh. 1 at §§ 10, 13).

23. The water Shelton supplied was not sanitary and was not adequate for 250 cows.

24. Shelton knew or should have known the water was not sanitary or adequate and created an undue risk to Plaintiffs of which they were not aware. As shown on the "Water

Analysis" attached hereto as **Exhibit 3**, the level of manganese in the water was twice the recommended limit.

25. Attached as **Exhibit 4** are true and accurate pictures of the water existing on the leased premises during Price's tenancy, and this water supplied the dairy operation and the residential areas of the home where Price and his wife lived. Plaintiffs had to repair or replace equipment and other goods (including dishwashers and other household items) more frequently than should have been required or expected.

26. Plaintiffs incurred approximately $20,000-$30,000 to address these problems and mitigate the losses Plaintiffs were incurring as a result of these problems. Those repairs and attempts to remedy were of no avail.

27. Plaintiffs were not aware, and could not have been aware, of the high bacteria levels in the water or the high levels of manganese. The defects resulting in the high bacteria and high levels of manganese were major defects hidden underground, and Plaintiffs could not have been expected to know or anticipate these problems. Shelton knew or should have known about these defects and the high levels of bacteria and manganese. Upon information and belief, he took steps to conceal these defects from Plaintiffs, including by flushing the water system before an inspection by Price, so that it would appear normal, all while knowing the issues would return soon afterward.

28. As a result of high manganese levels in the water and bacteria from the wells and underground water storage box, the health of Plaintiffs' dairy cows and the milk production of such cows were significantly impaired and diminished, and Plaintiffs suffered other damages, including a higher than normal mortality rate, particularly for calves; decreased, and lower even than average, milk production, which also decreased the revenues Plaintiffs reasonably expected

to receive; and the cost every three to four months for cleaning out all the lines and above-ground tanks.

29. In August 2017, the Milk Co-Op provided the LLC with a 90-day notice of termination of its contract due to the bad water and the effects on the health of Plaintiffs' herd. Plaintiffs had already lost approximately $30,000 due to deductions in the price paid for the milk as a result of the high bacteria counts from the water.

30. Shelton accepted responsibility, and stated that he was going to fix the problems with the water supply. Shelton told Plaintiffs that he would not let the contract between the Milk Co-Op and the LLC get cut off as a result of these problems. Shelton's statements acknowledged his duties under the Lease Agreement, including to provide sanitary running water, to have the premises in proper working order at the time of the Lease Agreement, and to repair and/or replace major structural items.

31. Price had approximately $15,000 worth of barley stored in a silo at or around this time. Price told Shelton not to cover the barley with more silage, because if the contract with the Milk Co-Op did get cut off, Price would need to sell the herd and would need to mitigate additional losses by selling the barley. Shelton ignored Price's request, and covered the barley anyway with more silage, making it unusable to Price.

32. Plaintiffs also requested that Shelton perform the maintenance required to fix the issues leading to the bad water, including repair of the wells and/or the underground storage box, but Shelton did not act. Plaintiffs were unable to milk at all after October 2017, and had to sell the herd to mitigate losses. The sale garnered less than market price due to the poor health of the herd.

33. In December 2017, Shelton finally attempted to repair the underground storage box, but by that time, Plaintiffs had already vacated the premises.

34. The damage to Plaintiffs totals not less than $1,500,000, consisting of the over $800,000 in lost profits from milk production during the term of the lease; $200,000 in capital investments; $185,000 in losses for increased mortality rates and other damages to Plaintiffs' herd; $30,000 for the deductions from the LLC's milk contract as a result of the high bacteria count in the water; loss of an additional $50,000 that would have been expected from the sale of a healthy and full herd; $30,000 for repairs; an additional $55,000 in relocation costs; unlawful retention of Price's security deposit in the amount of $8,500; lost barley worth approximately $15,000; and additional compensatory damages.

## Count I
## Breach of Contract

35. Plaintiffs incorporate the above allegations.

36. The Lease Agreement required Shelton to have the leased premises in proper working order at the effective time of the lease.

37. The Lease Agreement required Shelton to perform major structural maintenance due to acts of God and replacement of any structures.

38. The Lease Agreement required Shelton to supply sanitary running water, adequate for 250 cows, for all of the leased premises, including the dairy and the home.

39. The Lease Agreement required Shelton to have the leased facilities in compliance with all applicable laws, ordinances and regulations of duly constituted public authorities.

40. The LLC was a third-party beneficiary of the Lease Agreement.

41. Shelton breached the Lease Agreement by failing to have the leased premises in proper working order at the effective time of the lease.

42. Shelton breached the Lease Agreement by failing to perform major structural maintenance due to acts of God and replacement of any structures. Shelton acknowledged repair or replacement of the underground storage box was his responsibility when he attempted to repair the box, only such attempt came too late.

43. Shelton breached the Lease Agreement by failing to supply sanitary running water, adequate for 250 cows, for all of the leased premises, including the dairy and the home.

44. Shelton breached the Lease Agreement by supplying water to the premises which contained higher than acceptable levels of manganese and coliform bacteria.

45. Plaintiffs have been damaged as a result of Shelton's breach of the Lease Agreement.

### Count II
### Violation of Va. Code § 55-225.19

46. Plaintiffs incorporate the above allegations.

47. Va. Code § 55-225.19 requires a landlord to itemize the amount of the security deposit and any deductions, damages, or charges to be applied to a security deposit in a written notice to the tenant within 45 days after termination of the tenancy and delivery of possession. The landlord must dispose of the security deposit, including by returning it to the tenant and providing the written notice described above, within this 45-day period. *Id.*

48. The Lease Agreement also covered Price's residential use of the home, and such tenancy is subject to the requirements of Va. Code § 55-225.19.

49. Price does not owe rent to Shelton, and the premises was not damaged in any manner beyond reasonable wear-and-tear.

50. Shelton has refused to remit Price the security deposit of $5,500. Shelton also did not provide a statement to Price concerning the status of the deposit within 45 days after

termination of the tenancy and delivery of possession, as required by Va. Code § 55-225.19.

51. Shelton did not comply with Va. Code § 55-225.19, and has retained Price's security deposit of $5,500. As a result, and under Va. Code § 55-225.19, Price is entitled to return of the deposit, together with any actual damages and reasonable attorney fees.

### Count III
### Negligence / Gross Negligence

52. Plaintiffs incorporate the above allegations.

53. Shelton knew or should have known of the hazards presented by the unsafe water on the property, and of the conditions existing on the premises that gave rise to those hazards.

54. Shelton had the duty to exercise the skill and diligence of a reasonably prudent landowner, and the duty to exercise reasonable and ordinary care to prevent damage to Plaintiffs' property from a condition about which Shelton knew or should have known existed and would cause damage to Plaintiffs' property.

55. Shelton also had a duty to warn Plaintiffs of any dangerous condition existing on the premises which he knew or should have known about and of which Plaintiffs were unaware.

56. As landlord, Shelton also had a duty to maintain the premises in good repair and free of latent defects in the areas over which he had control.

57. Shelton breached these duties, which caused damage to Plaintiffs.

58. Shelton's conduct was grossly negligent and showed an absence of diligence and ordinary and reasonable care, and such indifference to others as constitutes an utter disregard of caution amounting to a complete neglect of the safety of others and lack of even slight care.

59. As a result of Shelton's negligence and/or gross negligence, Plaintiffs have suffered significant damages.

60. As a result of Shelton's gross negligence, Plaintiffs are also entitled to an award of punitive damages.

## JURY DEMAND

Plaintiffs request trial by jury for all claims and issues so triable.

WHEREFORE, Plaintiffs Cassidy Price, Christian Price, and Price Brothers Jerseys, LLC, f/k/a M&P Dairy, LLC, move for judgment against Defendants H. Ronald Shelton and Ronald E. Shelton, jointly and severally, in the amount of $1,500,000, plus punitive damages in the amount of $350,000, together with their reasonable attorney's fees, costs, and such additional relief the Court deems just and proper.

                                                                  CASSIDY PRICE,
                                                                  CHRISTIAN PRICE, and
                                                                  PRICE BROTHERS JERSEYS, LLC
                                                                  f/k/a M&P DAIRY, LLC
                                                                  By Counsel

/s/ Andrew S. Baugher
ANDREW S. BAUGHER (VSB #74663)
MICHAEL E. DERDEYN (VSB #40240)
Of Lenhart Pettit
90 North Main Street, Suite 201
P. O. Box 1287
Harrisonburg, Virginia 22803
Tel: (540) 437-3138
Fax: (540) 437-3101
asb@lplaw.com
med@lplaw.com
*Counsel for Plaintiffs*

678723